IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| MICHAEL A. FRUMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ALTEC INDUSTRIES, INC., | ) | Division: |
| | ) | |
| Defendant. | ) | REQUEST FOR JURY TRIAL |
| | ) | |

SERVE:

    Registered Office:
    Capitol Corporate Services, Inc.
    222 E. Dunklin, Ste. 102
    Jefferson City, MO 65101

## COMPLAINT

COMES NOW Plaintiff Michael A. Frump, by and through under signed counsel, and for his claims against Defendant Altec Industries, Inc. ("Defendant"), states as follows:

1. Plaintiff Michael A. Frump ("Plaintiff") is a resident of the State of Missouri.

2. Defendant Altec Industries, Inc. is an Alabama corporation with its principal place of business in Alabama.

3. Defendant does business in Missouri and is properly registered to do so.

4. Defendant can be served through its Registered Office, Capitol Corporate Services, Inc., 222 E. Dunklin, Ste. 102, Jefferson City, Missouri 65101.

5. This case involves the intentional tort of discrimination and retaliatory discharge from employment for seeking Worker's Compensation benefits, in violation of R.S.Mo. § 287.780, *et seq.*

6.  Plaintiff worked at Defendant's facility located in St. Joseph, Buchanan County, Missouri.

7.  Defendant took adverse actions against, including discharging Plaintiff, while at Defendant's facility in St. Joseph, Buchanan County, Missouri.

8.  Defendant employs more than five people and is an "employer" within the meaning of the Missouri Worker's Compensation Law pursuant to § 287.030, R.S.Mo.

9.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because complete diversity exists amongst the parties and the amount in controversy exceeds $75,000.

10. Venue is proper in the St. Joseph Division of this Court pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 3.2(b)(1).

## RETALIATION BASED ON THE EXERCISE OF WORKERS' COMPENSATION RIGHTS IN VIOLATION OF R.S.MO. § 287.780

11. In May 2004, Plaintiff was hired by Defendant as an Assembly Worker in Defendant's St. Joseph facility.

12. In 2012, Plaintiff was promoted to the position of Press Operator.

13. Plaintiff continued in this position until his termination on July 24, 2019.

14. On March 14, 2018, while in the course and scope of employment, Plaintiff slipped on a ramp and tumbled, eventually landing on a pile of vehicle parts.

15. As a result of the fall, Plaintiff suffered injuries to his knee and back, as well as both arms and shoulders.

16. Plaintiff received authorized medical treatment for his knee and back injuries, but no treatment was offered for his shoulders.

17. Plaintiff received conservative treatment for his back, and was soon released from care as to his back but continued to treat with the knee specialist.

18. Plaintiff continued to work with moderate work restrictions, but continued to have to use his shoulders and arms, extensively.

19. This frequent use caused Plaintiff extreme pain, which at times was very debilitating.

20. Plaintiff reported these extreme problems to the physician treating Plaintiff's knee injury.

21. The physician stated Plaintiff's symptoms indicated a torn rotator cuff.

22. The physician warned Plaintiff that continued use of a torn rotator cuff could result in the tear becoming larger.

23. However, because the physician was not authorized to treat Plaintiff's shoulders, he did not provide any diagnostic tests or work restrictions based on these complaints.

24. Plaintiff ultimately underwent surgery on his knee.

25. During a follow-up appointment, Plaintiff again brought up his frequent, intense pain in his arms and shoulders.

26. The authorized physician advised Plaintiff to file "another claim" with Defendant's workers' compensation insurer so that treatment for those body parts would be offered.

27. Plaintiff contacted the insurer and asked to file a second claim.

28. Defendant, acting through its workers' compensation insurer, denied treatment of Plaintiff's injured arms and shoulders.

29. Plaintiff retained legal counsel to assist in getting his medical treatment.

30. Plaintiff's workers' compensation attorney filed a formal Claim for Compensation to pursue medical treatment.

31. Defendant continued to refuse to provide medical treatment for Plaintiff's work-related injuries.

32. A Hardship Hearing was scheduled to be held on July 11, 2019 before the Division of Workers' Compensation to compel Defendant to provide medical treatment.

33. Plaintiff, his legal counsel, and legal counsel for Defendant arrived at the Division of Workers' Compensation on July 11, 2019 to try the underlying workers' compensation case at the Hardship Hearing.

34. Just before the Hardship Hearing was to begin, Defendant agreed to send Plaintiff for an examination by an orthopedic upper extremity physician.

35. Plaintiff continued to work while he waited for the appointment with the orthopedic specialist.

36. Plaintiff continued to suffer severe and persistent pain in his back, shoulders, and arms.

37. Plaintiff was ultimately diagnosed with a ***torn rotator cuff in each arm***.

38. On or about July 22, 2019, Plaintiff was seated at his work bench eating his lunch.

39. That day, Plaintiff's back and arms were causing Plaintiff immense pain.

40. Plaintiff took his regular lunch break, which ended at noon.

41. The pain was so severe Plaintiff contemplated going home sick after lunch.

42. Just after noon, Plaintiff remained seated to relieve his back pain and he continued to contemplate whether he could complete his shift.

43. Plaintiff titled his head downward to further relieve pain from his torn rotator cuffs.

44. Plaintiff was wearing his tinted safety glasses which obscured his eyes from the view of his coworkers.

45. Unbeknownst to Plaintiff, his face was obscured from Defendant's surveillance cameras due to camera placement with respect to Plaintiff's work bench.

46. At approximately 12:18 p.m., Plaintiff's coworker, Donald Edwards approached Plaintiff from behind to ask him a question about the location of some pieces of hardware for a particular machine.

47. Plaintiff immediately responded to Edwards, accompanied Edwards to check the equipment in question, asked Edwards what time it was, and returned to work.

48. Two days later, on July 24, 2019, Plaintiff's supervisor Richard Ortega called Plaintiff into his office.

49. Supervisor Roy Noland and Human Resources representative Katie Nutzman were also present at this meeting.

50. Plaintiff was relieved upon seeing these individuals, as he believed he had gotten a promotion he had applied for earlier.

51. The job for which Plaintiff applied would have been much easier on his injured arms.

52. However, Ortega told Plaintiff that he was being discharged from employment with Defendant.

53. Plaintiff asked why he was being terminated.

54. Ortega told Plaintiff that he was being terminated for sleeping on the job on July 22.

55. Plaintiff denied that he was sleeping on the job.

56. Plaintiff explained that he was sitting on his desk because he was experiencing tremendous pain.

57. Ortega and Harbin identified multiple people who had reported seeing Plaintiff asleep at that time.

58. None of these individuals approached Plaintiff from an angle that would allow them to determine whether or not Plaintiff was actually asleep on July 22, 2019.

59. Other than Donald Edwards, none of the alleged witnesses interacted with Plaintiff to discover whether or not Plaintiff was sleeping.

60. Donald Edwards approached Plaintiff from behind.

61. Donald Edwards could not have seen whether or not Plaintiff's eyes were closed or if Plaintiff was asleep.

62. Plaintiff had responded to Donald Edwards's question immediately because Plaintiff was awake—Plaintiff could not have processed the question if he were sleeping.

63. Further, in Donald Edwards' statement regarding the events he states that two other employees *told* Edwards that Plaintiff was sleeping.

64. Edwards's statement does not indicate that he *saw* Plaintiff sleeping when Edwards addressed him as he approached from behind.

65. Further, none of Defendant's employees checked on Plaintiff to determine if he was in medical distress, despite knowing that Plaintiff had diabetes and work-related injuries.

66. Jeremy Ellis's statement provides that David Wilson *told* Ellis that Plaintiff was sleeping.

67. Ellis then states that he "went to check [and] found him there asleep."

68. Ellis never addressed Plaintiff nor did Ellis situate himself so as to actually be able to confirm whether or not Plaintiff was asleep or, simply, sitting.

69. As part of the investigation into Plaintiff's alleged policy violation, Harbin sent Jonathan Arens and Richard Ortega an email.

70. In the email, Harbin states "Camera 8 actually *kind of* shows him with his head down sleeping."

71. Harbin states that Camera 7 would show a better angle, but she used Camera 8 because "on 7 the only thing you could see was [sic] Mike's legs hanging off of the tool board and not the rest of him."

72. In his fifteen (15) years of employment with Defendant, Plaintiff never received formal disciplinary action for workplace misconduct prior to his termination on July 24, 2019.

73. Defendant's policy which prohibits sleeping on the job states, in part: "lesser violations may warrant levels of disciplinary action prior to an Associate's termination."

74. True to this policy, Defendant regularly punishes employees found to be sleeping on the job via a written warning.

75. Plaintiff believes that at least three other employees—Don Watson, James Perez, and Matt Berry—were given only written warnings for being found asleep on the job.

76. None of these three employees given written warnings had exercised workers' compensation rights just before such incidents.

77. Following his discharge, Plaintiff was examined by the orthopedic specialist selected by Defendant.

78. The authorized orthopedic specialist immediately placed Plaintiff on severe work restrictions, including lifting limitations and restricted motions for Plaintiff's arms.

79. These restrictions would have prevented Plaintiff for doing the types of tasks Plaintiff was doing on July 22, 2019, which had caused such great pain to Plaintiff's arms and back.

80. Following his discharge, Plaintiff applied for unemployment benefits.

81. Defendant protested Plaintiff receiving unemployment benefits.

82. Edwards's statement, Ellis's statement, Harbin's email, and an indecipherable, grainy screenshot from a security camera constitute the entirety of the evidence provided by Defendant.

83. Plaintiff was initially denied unemployment benefits.

84. Plaintiff, acting *pro se*, appealed this initial decision and was awarded benefits by the Appeals Referee.

85. Upon information and belief, Defendant gave a *write-up* to Don Watson as punishment for sleeping on the job.

86. Upon information and belief, Defendant gave a *write-up* to James Perez as punishment for sleeping on the job.

87. Upon information and belief, Defendant gave a *write-up* to Matt Berry as punishment for sleeping on the job.

88. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

89. Plaintiff was injured while in the course and scope of his employment with Defendant.

90. Defendant took adverse actions against Plaintiff, including but not limited to falsely accusing Plaintiff of workplace misconduct, discharging Plaintiff from employment, and protesting Plaintiff receiving unemployment benefits.

91. The motivating factor in these adverse employment actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's exercise of his rights under the Workers' Compensation Law of Missouri, including, but not limited to, seeking medical care, retaining legal counsel, filing a formal Claim for Compensation, utilizing work restrictions, convalescing, and pursuing time-off work benefits.

92. The reason provided for Plaintiff's termination is false and pretextual.

93. The adverse actions of Defendant, including Plaintiff's discharge from employment, were acts of retaliation, in violation of 287.780 R.S.Mo. which states as follows:

> No employer or agent shall discharge or discriminate against any employee for exercising any of his or her rights under this chapter when the exercising of such rights is the motivating factor in the discharge or discrimination. Any employee who has been discharged or discriminated against in such manner shall have a civil action for damages against his or her employer.

94. The conduct of Defendant, as set forth above, was done with evil motive or in reckless disregard for the rights of Plaintiff.

95. As a direct and proximate result of Defendant's unlawful conduct, including wrongfully discharging Plaintiff's employment, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; and for all other relief deemed just and proper by this Court.

### **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,

 */s/ Daniel L. Doyle*_____
Daniel L. Doyle, MO Bar No. 37305
Robert A. Bruce, MO Bar No. 69985
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas 66101
Telephone: (913) 371-1930, ext. 109
Facsimile: (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.con
ATTORNEYS FOR PLAINTIFF